# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF COLORADO
Bankruptcy Judge Joseph G. Rosania, Jr.

| | |
|---|---|
| In re:<br><br>MATTHEW CARL YOUNG,<br>SSN: xxx-xx-9462<br><br>   Debtor. | Bankruptcy No. 20-13234-JGR<br>Chapter 7 |
| COLARELLI CONSTRUCTION INC.,<br><br>   Plaintiff,<br><br>v.<br><br>MATTHEW CARL YOUNG,<br><br>   Defendant. | Adversary Proceeding No. 20-1280-JGR |

## OPINION AND ORDER

THIS MATTER comes before the Court following a two-day evidentiary hearing held via Zoom on November 9-10, 2021, on Colarelli Construction Inc.'s two claims seeking denial of discharge under 11 U.S.C. § 727(a)(2)(A) and (a)(4)(A).

Section 727(a) of the Bankruptcy Code enumerates scenarios that require a bankruptcy court to deny a debtor's chapter 7 discharge. This case concerns two provisions that deny a discharge for fraudulent transfers or false oaths. After engaging in a fact-intensive analysis involving innumerable people, businesses, bank transfers, and alleged non-disclosed gifts, the Court concludes that Defendant-Debtor Dr. Matthew Young is entitled to his chapter 7 discharge.

## JURISDICTION

In the Complaint and Answer, the parties do not dispute the jurisdiction or venue of the Court and both parties consent to the entry of final orders by the Court. This is a core proceeding under 11 U.S.C. § 157(b)(2)(J), the Court has jurisdiction under 11 U.S.C. § 157(a) and 157(b)(1), and venue is proper according to 28 U.S.C. § 1409(a). Although Young denies that this proceeding was timely filed, it was filed on October 13, 2020, following an order in the main case granting Colarelli an extension to object to discharge no later than that same date. Therefore, this proceeding was timely filed under Fed.R.Bankr.P. 4004.

**FACTS**

**I. Young's History, Business Entities, and Bank Accounts**

After completing medical school, residency, and military service, Young entered the private practice of medicine in 2002. In 2003, he started a medical practice, Woodland Park Family Medicine ("WPFM"). During or near 2019, WPFM stopped operating when Young and six other physicians, including a Dr. Malyszek, created a multidisciplinary medical practice, Highlands Medical Group, along with an associated business, Highlands Imaging Center (collectively, "Highlands"). It is unclear who hired Colarelli and on what terms, but Colarelli performed construction work in service of the nascent Highlands medical venture. Colarelli performed this construction without a signed agreement from Young personally. This construction work, for which Colarelli has not been paid, is the source of Young's debt to Colarelli.

To support Highlands' operations, Young transferred WPFM's accounts receivable and medical equipment to Highlands. By approximately spring 2019 Young stopped seeing patients at WPFM and started seeing patients only at Highlands, many of whom had been his patients at WPFM. When the Highlands neurologist got cancer and pulled out of the plan, the other physicians got cold feet and followed suit. Ultimately, Highlands did not last long and Young returned to practicing medicine at WPFM, as its sole practitioner, in spring 2019.

In March 2019 Young created the entity Young Family Medicine, LLC ("YFM") in order to separate himself from WPFM, which he owned with two other physicians. Under Young's ownership, YFM never did any business and never treated medical patients. Young was the sole member of the YFM LLC. Although Young intended to form YFM as a PLLC, he mistakenly formed it as a standard LLC. YFM kept a bank account that appears on various bank statements in this case as "Young Family Med." YFM did not start operating, and Young did not start working there, until he sold it to his girlfriend, Kristen Sekelsky, a nurse practitioner, in August 2019. Like his venture at Highlands, Young brought many of his former patients—approximately 3,000—to the newly-formed YFM medical practice. Shortly thereafter, in April 2020, Young left YFM and started working at QwikCare urgent care. Since August 2020 he has practiced medicine at Elevated Family Care, a practice founded and owned by Sekelsky.

Another of Young's business entities that appears in this case is Matthew Young P.C., a personal pass-through tax entity formed by his accountant. It has never done any actual business. He used it to receive personal income for his physician role at WPFM. Matthew Young P.C.'s bank account appears on various bank statements in this case as "Matthew Youn[g]."[1] At all relevant times only Young and his office manager[2] had access

---

[1] For ease of readability, the Court will refer to this bank account as "Matthew Young," not "Matthew Youn" as it appears on the bank statements.
[2] The parties never affirmatively identified the office manager, but the Court notes for clarity's sake that it was not Sekelsky.

to the Matthew Young P.C. bank account. His office manager was authorized to pay bills out of this account but could not make other transfers without his approval.

In addition to his entities' bank accounts, Young also kept a personal bank account which appears on bank statements as "Young Matthe[w]."[3] Young was the only authorized signer for his personal account.

Young and his ex-wife, April Young, divorced in May 2019. They share custody of their three children who spend 38% of their time with Young. His current, negotiated domestic support obligation is $9,025 per month. His monthly domestic support listed on his bankruptcy petition is $6,824, which represents a 50% wage garnishment. April Young is disabled, does not work, and relies on Young to survive. Young is current on his domestic support obligations.

In spring 2019 Young started to experience significant health issues and continues to take medication for the treatment of various ailments. The Department of Veterans Affairs considers Young 100% disabled, for which he receives $2,033 in monthly benefits.

Young and Sekelsky first met in 2014 or 2015 when Sekelsky was a nurse practitioner intern at Young's medical practice. Although the exact starting date and continuity of their romantic relationship is unclear, Young and Sekelsky have been romantically involved since 2018 and living together since at least August 2019. They are/have been engaged to marry. Sekelsky believes that Young is a great physician, but that he's a poor businessman who has difficulty keeping track of his personal calendar and should not be running a business.

## II. Colarelli's Judgment, Garnishments, and Young's Ensuing Bank Transfers

On April 25, 2019, in the Colorado District Court for the District of El Paso, Colarelli obtained a default judgment against Young (and Highlands Imaging Center) for its unpaid construction work performed on behalf of Highlands. Young did not defend or appeal the state court action because he lacked funds to hire an attorney, whereas in the same suit his business associate, Dr. Malyszek, defeated Colarelli's claims on summary judgment because he was not personally liable on the construction contract. Young believes he could have achieved a similar outcome if he had defended the suit.

Several weeks after the default judgment against Young, Colarelli obtained writs of continuing garnishment in the principal amount of $291,783. The writs of garnishment were served on YFM, WPFM, and Matthew Young P.C. on July 15, 2019 at 9:12 AM. Young testified that his poor psychiatric state at the time prevented him from understanding the significance of the lawsuit and resulting garnishments.

Colarelli's judgment against Young remains largely unsatisfied. Young listed the judgment in his bankruptcy schedules as a "Nonpriority Unsecured" claim in the amount

---

[3] For ease of readability, the Court will refer to this bank account as "Young Matthew," not "Young Matthe" as it appears on the bank statements.

of $281,673. The Court notes that Colarelli did not file a proof of claim or present a witness from Colarelli at trial.

Immediately after service of the garnishments, a series of transfers were made out of the "Matthew Young" P.C. bank account and into Young's personal account: $6,000 on July 15, 2019; $15,000 on July 16, 2019; and $6,800 on July 17, 2019. These transfers total $27,800 in the three days immediately following service of the WPFM and Matthew Young P.C. garnishments. Over the next month, between July 18, 2019 and August 16, 2019, Young's personal non-garnished account also received upwards of $25,000 in transfers from WPFM.

Young testified, and bank records confirm, that around this time he was using his "Matthew Young" P.C. account to pay various WPFM expenses, like salaries. He testified that he was trying to keep his businesses afloat and pay his various business and personal liabilities, like wages and domestic support, respectively.

### III. Sale of YFM to Sekelsky and Transfer of WPFM Assets to YFM

On August 15, 2019, while practicing at WPFM, Young sold his interest in YFM (the entire interest of YFM) to Sekelsky for $1 through an asset purchase agreement. Young testified that he valued YFM at $1 because it had no assets at that time, he had created the entity incorrectly as an LLC not a PLLC, and it had never actually operated as a business. He also added that it is illegal to sell goodwill in medicine and that a medical practice does not own patients. Young testified that although YFM may have had between $400-1,000 cash on hand as of the closing date, his failure to include that value in the sale price was an oversight on his part. Although YFM itself was not operational, Young testified that he thought the cash "had to be paid to my [WPFM] employees, things like that."

Also on August 15, 2019, Young and Sekelsky executed an asset purchase agreement that transferred the assets of WPFM to YFM (now owned by Sekelsky), including patient records, contracts, medical and business equipment, and more. Explicitly, WPFM did not transfer its accounts receivable or its liabilities like unpaid employee compensation. In total, Young sold WPFM's assets to Young Family Medicine for $2,600. Young testified that he did not want the financial responsibilities of being an owner anymore—and was advised to that end by his psychiatrist and attorney.

Sekelsky started operating YFM as a medical practice immediately after the transfer, at which point Young stopped operating WPFM and started seeing patients as an independent contractor for YFM. Sekelsky also saw patients at YFM. When Young switched practices from WPFM to YFM, about 3,000 of his patients followed him. Young's patients were a revenue stream that Young relied on when switching practices and in evaluating the expected profitability of YFM, which confirms Sekelsky's belief that Young was a great doctor. Sekelsky had been working as a nurse practitioner at a medical clinic called Peak Vista. About 100 of her patients followed her to YFM. YFM operated in the same office building and had the same landlord as WPFM. At some unknown point in time, Sekelsky, converted YFM to a PLLC.

4

According to Sekelsky's testimony, it is not possible to transfer a medical practice or to transfer insurance contracts between medical practices. Any entity with a new tax ID—even if the medical providers are the same—requires a re-starting of the credentialing process with all the various payors/insurers. Practices do not own patients. Patients are free to get care wherever they choose. Because of this, Sekelsky maintains that the transfer of WPFM assets and YFM shares to her was not a transfer of a practice; rather it was basically the start of a new practice under the YFM tax ID that had not yet been used. Sekelsky did not have a specific answer for why she purchased and converted the YFM LLC instead of starting her own from scratch. She testified that "It was the offer [she] was given, at the time, it sounded fine to [her]."

After the transfer, as contemplated in the asset purchase agreement, WPFM still received payments on its receivables from services rendered pre-transfer. According to bank records, WPFM took in approximately $50,000 in September 2019. However, during that same month, WPFM transferred approximately $22,400 to YFM[4] despite YFM not being entitled WPFM's accounts receivable under the asset purchase agreement. In October 2019 WPFM transferred an additional $4,000 to YFM. Young testified that at least some of these transfers were to pay back wages for employees.

In September 2019, YFM transferred $2,000 back to WPFM and paid approximately $17,000 in ADP wage and tax payments. Young testified that, at the time, he calculated approximately $25,000 of unpaid wages were owed by WPFM, in addition to other debt for purchases. Young admitted that he transferred more than would have been necessary from WPFM to cover its expenses out of the YFM account in September 2019.

## IV. YFM Operations, Personal Incomes, and Home and Truck Purchases

### A. YFM Operations and Bank Transfers

While Sekelsky operated YFM, she and Young were the main medical providers, although YFM also utilized an allergy specialist. Sekelsky was the owner and Young was an independent contractor. Young, Sekelsky, and the office manager had access to the YFM bank account.

Prior to winding down WPFM, Matthew Young P.C. paid WPFM's rent, as evidenced by a check dated May 29, 2019. After transferring ownership to Sekelsky, YFM paid rent to the same landlord, HF Holdings, as evidenced by checks dated September 5 and 26, 2019. Young signed all three rent checks despite the fact that Sekelsky was the owner and operator of YFM in September 2019—not Young. In fact, Young signed all of YFM's checks from September 26, 2019, until January 3, 2020, even though he was not the owner of YFM and admittedly should not have been signing them after transferring YFM's ownership to Sekelsky. He testified that at that time he was simply trying to survive and pay off WPFM's debts. He was paying his obligations from whatever bank account

---

[4] Including a $2,200 transfer that occurred on September 30, 2019, and appears not to have landed in YFM's account until October 1, 2019, and subtracting a $2,000 transfer from YFM to WPFM (a net reduction in the total amount transferred) on September 3, 2019.

5

he could in order to try to keep the business afloat, pay employees, and pay his domestic support obligations. His understanding was that any money he received from the various entities would be counted as income on his professionally-prepared tax return.

Many post-transfer YFM checks signed by Young were for his personal expenses, including $5,000 to Young's bankruptcy counsel on November 6, 2019. Sekelsky testified she did not know of Young's $5,000 bankruptcy retainer check and found out about it at her deposition for this adversary proceeding.

In November and December 2019 there were also several transfers, amounting to approximately $19,300, from the YFM account to Young's personal account. Young testified that he cannot admit to making these transfers and that his office manager made most of them. Also, the YFM account transferred $5,500 to a Logan Young savings account (Young's son) during the course of one week spanning the end of December 2019 and the start of January 2020. Young and his ex-wife are also listed on the Logan Young account.

On December 31, 2019, a $4,000 transfer was made from the Logan Young account to "SEKELSKY KRI." Sekelsky testified that she either did not remember or did not know anything about this transfer. On January 2, 2020, there was a second transfer of $5,000 from the same account to the same account. Sekelsky's deposition testimony was that she assumed this was a transfer to her but that she was not aware of providing anything in exchange for that $5,000.

### B. Young's Income

Prior to the sale of YFM and WPFM's assets, Young received approximately $27,000 in income from WPFM for the period of April 17, 2019 to June 17, 2019 ($13,500 per month). This income was split between his "Matthew Young" P.C. bank account and his "Young Matthew" personal bank account. Some of Young's income from WPFM appears on his bank statements as transfers from the "Young Family Med" account, even though YFM was not operational at the time; the YFM transfers involved funds ultimately from WPFM.

When Young started working at YFM in August 2019, he was a 1099 employee who did not receive a regular salary—he would receive more or less depending on how much money was coming in. Although Young started working for YFM on August 15, 2019, immediately following the transfer to Sekelsky, his personal bank account did not receive any financial transfers from YFM until mid-November to mid-December 2019, which were in varied, round amounts at irregular intervals. Young labeled those transfers as "draws" on his bankruptcy filings. He testified "draws" typically signifies transfers to an owner and that those draws were made by his office manager, at either his or Sekelsky's direction. After receiving the total of $17,200 from YFM in November and December 2019, Young did not receive any more income during the duration of his contract with YFM. His "Matthew Young" P.C. account did not receive any deposits from YFM during this time. He began working at QwikCare in April 2020.

On Young's 2019 tax return, the box for "Did you materially participate in the operation of [YFM] during 2019?" was checked yes, despite YFM never operating when Young owned it. Young testified that his accountant checked this box and he did not know the reason why.

### C. Sekelsky's Income

Sekelsky's take home salary while working part time at Peak Vista just prior to YFM was approximately $4,600 per month. As the owner of YFM, Sekelsky's take home salary rose to approximately $9,400 per month. Sekelsky testified that she was working more hours at YFM (40+ compared to 25-30) and had more responsibilities as the owner, like dental insurance for the practice, payroll, rent, etc. When Sekelsky closed YFM, it did not have any outstanding debts.

After closing YFM and starting at QwikCare, in April and May 2020 Sekelsky still received regular salary payments from YFM. She also took a $5,000 draw from YFM on April 9, 2020. Sekelsky testified that her accountant had instructed her to keep paying herself and pay off all outstanding YFM bills.

At QwikCare, while working part time, Sekelsky's monthly take home salary fell to $3,876. Currently, her regular take home salary while working full time at Elevated Family Care has been $6,270. She testified that she also has taken draws from Elevated Family Care.

### D. Home and Truck Purchases

On August 29, 2019, 14 days after purchasing YFM, Sekelsky closed on the purchase of a new-build home for her and Young to live in together. The two had previously picked out the home and its various options (flooring, wall color, cabinets, etc.) together. Sekelsky put down a deposit on the home approximately six months prior. Young was unable to obtain a loan at the time and his name was not on the mortgage. However, Young paid $19,000 to landscape the house and also contributed to the purchase of the house via a $40,000 gift to Sekelsky taken from his 401k. Pursuant to an agreement between the couple, in exchange for the gift, Young lived in the house and Sekelsky added him to the title after closing. The gift check was executed on April 18, 2019, though the gift was memorialized in a gift letter dated July 30, 2019. This gift was not disclosed on Young's bankruptcy petition, statements, or schedules. Young testified that he did not include the $40,000 transfer because it was given in exchange for being titled on the home.

The home is four bedrooms, four baths, with five full-time occupants (Young, Sekelsky, and her three children) and three additional part-time occupants (Young's three children), yielding eight total occupants for 38% of the time.

Young did not contribute to household expenses for some time after the closing on the home. In December 2019 Young made two transfers to Sekelsky, one for $4,000 and one for $5,000, which he testified represented his share of living expenses going forward, which is why he did not list the transfers on his bankruptcy petition, statements, or

7

schedules. Around this time, Sekelsky was paying most of the household expenses like the mortgage, groceries, and utilities.

The home is subject to two mortgages and Sekelsky is the only one obligated on the notes. However, both Young and Sekelsky are now on the title to the home. On Young's bankruptcy paperwork, he indicated that he was responsible for the mortgage because he "figured it was my share of where I lived, can't live for free." Young began consistently paying the first mortgage in May 2020, while Sekelsky has been paying the second mortgage. Sekelsky testified that she does not expect to allow Young to live in the home for free.

In August 2019 Sekelsky purchased a new 2019 Nissan Titan truck, primarily for Young's use, and added his name to the title. He is the truck's primary driver. Young is not obligated on the debt for the truck purchase and he did not include it in his bankruptcy schedules.

**V. Ascentium Capital's Garnishments and the Formation of Elevated Family Care**

On December 23, 2019, after obtaining a judgment against WPFM and Young, Ascentium Capital, LLC, served a writ of garnishment on YFM's bank account. In response, Sekelsky wrote to Ascentium's lawyer, Brad Dempsey, informing him that Young did not have any financial affiliation with YFM. Via an email, Dempsey stated that WPFM is now known as YFM—which Sekelsky testified was his own erroneous assumption.

Neither Sekelsky nor YFM ever owed any money to Ascentium Capital. Sekelsky never recovered Ascentium's one-time $10,000 garnishment taken from YFM. Immediately following the garnishment, Sekelsky moved YFM's accounts from Vectra Bank to Wells Fargo. The Wells Fargo YFM account was never garnished.

In March 2020 Sekelsky shut down YFM. In April 2020 she and Young joined the QwikCare urgent care medical practice as employees. Because of the unsanitary, unprofessional, and potentially illegal practices Sekelsky observed at QwikCare, she formed a new entity, Elevated Family Care, as a backup.

On May 12, 2020, the same day as Young's bankruptcy filing, Sekelsky officially formed Elevated Family Care. As to the timing, Sekelsky testified that she had no idea when Young filed for bankruptcy; she had not had conversations with Young's bankruptcy counsel; and did not participate in Young's bankruptcy filing in any way. Sekelsky formed Elevated Family Care through a company called VIM Business that files entity formation documents with a secretary of state's office. She submitted her information to VIM Business on May 10, 2020, and it took VIM Business a few days to officially form Elevated Family Care, which she testified was coincidentally on the same day as Young's bankruptcy filing. Sekelsky and Young have no joint debts and Sekelsky is not liable to Colarelli Construction in any way.

After a few months at QwikCare, Sekelsky started operating Elevated Family Care as its owner. Young joined Elevated Family Care on August 11, 2020. When Young joined

Elevated Family Care, he signed an employment agreement that included a $225,000 annual salary, plus potential bonuses.

Overall, despite the admitted administrative hassles that come with starting a practice, Sekelsky started two medical practices in one year: Elevated Family Care and YFM.

**VI. Bankruptcy Petition, Schedules, and Statement of Financial Affairs**

Young filed for bankruptcy on May 12, 2020, and scheduled over $4.4 million in unsecured debt. Young's bankruptcy paperwork certainly could have been more detailed and precise. At the time of his bankruptcy, Young had approximately $18,000 in monthly expenses—approximately $8,000 in personal "expenses" and $10,200 in child support obligations.

In May 2020 Young started making mortgage payments on the home purchased by Sekelsky. The home is subject to two mortgages. Young has been paying the first, larger mortgage payment while Sekelsky has been paying the second mortgage.

In a state court hearing on modification of Young's spousal maintenance on August 6, 2020, Young testified that he was paying all the housing costs and utilities—without contribution from Sekelsky—and most of the food costs, for himself, Sekelsky, his three children, and Sekelsky's three children. He testified that he paid a total of $6,232.93 per month for these items, whereas Sekelsky paid approximately $250 per month for food. In denying Young's request to modify spousal maintenance, the state court found that Young was paying 98% of housing, utilities, and food for himself, Sekelsky, and their children. Young testified in this Court that he disagrees with the state court's conclusion because it did not consider the home's second mortgage or that Sekelsky was paying for the truck, and maybe other expenses too. Young did not appeal the state court order but fired his lawyer from that proceeding and obtained a settlement with his ex-wife to modify his spousal support.

Young admitted that he omitted from his bankruptcy schedules the following transfers from him to Sekelsky, which he considered to be part of his cost of living: $40,000 gift on July 30, 2019; a $4,000 bank transfer on December 31, 2019; and a $5,000 bank transfer on January 2, 2020. He also omitted from his schedules numerous $500 payments to his mother, Eileen Young, made in the year prior to his bankruptcy. Young testified that although there was never any formal work arrangement with his mother and that she was not a W-2 employee, these were payments for work performed by her in connection to his medical practice—mainly calling patients on his behalf. Sekelsky confirmed this in her testimony. Although checks were written to his mother out of different accounts—YFM's account, WPFM's account, and Young's personal account—they were all to compensate her for services performed. They were tracked by an accountant.

In his bankruptcy schedules, Young listed his 2019 income as $41,800. He obtained the $41,800 figure from his 2019 tax return, which was prepared by a tax professional. In his Statement of Financial Affairs, he listed $24,172 of "other income"

9

from YFM in 2019. On his Schedule I he listed $2,033 for his VA benefits. In his schedules, he disclosed a USAA bank account with an estimated balance of $3,035 but which on May 12, 2020, the date of his bankruptcy filing, had a balance of $7,287. Young testified that he filled out this information in advance of the filing, likely on April 27, 2020, when the account balance was $3,035. Approximately one month after filing, on the Trustee Information Sheet dated June 11, 2020, Young disclosed a USAA bank account balance of $7,287.

On his bankruptcy schedules, Young listed $2,460 as his monthly "rental or home ownership" expenses, which he testified likely represented the first mortgage payment on the house. He testified that he was not obligated to pay the mortgage payment because he was not on the note, but he had a verbal agreement with Sekelsky for him to pay it. His schedules also list businesses he owns—WPFM, YFM (in contravention of the sale to Sekelsky), Vitality Aesthetics MediSpa, Highlands Imaging, and Highlands Medical Group—but does not include Matthew Young P.C. Young testified that omitting Matthew Young P.C. was just an oversight because it was not an active business. He testified that all the errors on his bankruptcy schedules were not intentional—and that in any event he did not believe there were very many errors on his schedules.

The chapter 7 trustee never asked Young to pay over any money, to appear for a deposition, or to answer any follow up questions after his 341 meeting and submitted a report of no distribution on July 6, 2020.

## DENIAL OF DISCHARGE CLAIMS AND DEFENSES

Colarelli seeks to deny Young's bankruptcy discharge by asserting two claims against him.

### I. Transfers

First, Colarelli asserts a claim under 11 U.S.C. § 727(a)(2)(A) alleging that Young made multiple transfers in the year prior to filing for bankruptcy in an attempt to hinder, delay, or defraud his creditors. The transfers include the transfer of Young's medical practice to Sekelsky, his girlfriend, which occurred after Colarelli commenced collections actions against Young. Colarelli further alleges that Young continued to exercise control over the practice's bank accounts and to receive compensation as if he were the owner of the business, not an employee. The transfers also include $49,000 transferred to Sekelsky and numerous $500 payments to Young's mother, Eileen Young.

In his defense, Young argues that his transfers were contemporaneous exchanges for value and/or that he transferred a valueless asset.

### II. Alleged False Oaths

Second, Colarelli asserts a claim under 11 U.S.C. § 727(a)(4)(A) alleging that Young made a false oath or account in connection with his bankruptcy filing because his sworn statement of financial affairs contains several inaccuracies/omissions including:

10

(1) Young failed to include the transfer of his medical practice to Sekelsky.

(2) Young failed to include the $49,000 in cash transfers to Sekelsky;

(3) Young listed his income for 2019 as $41,800, even though his income was substantially higher.

(4) Young failed to include the transfers to his mother, Eileen Young;

(5) Young included secured claims of Bellco Credit Union and Penny Mac on his list of secured claims, even though these claims were for mortgages in Sekelsky's name and Young is not obligated on either of the loans;

(6) Young listed $3,035 in his USAA account at the time of his bankruptcy filing when, in reality, the account held $7,287.

(7) Young failed to include his ownership interest in Matthew C. Young P.C.

In his defense, Young argues that several of these facts did not merit disclosure and any inaccuracies or omissions were immaterial and/or inadvertent.

## DISCUSSION

The Bankruptcy Code must be construed liberally in favor of debtors and against creditors. *In re Brown*, 108 F.3d 1290, 1292-93 (10th Cir. 1997). Still, bankruptcy's fresh start is limited to unfortunate debtors who are nonetheless honest. *Grogan v. Garner*, 498 U.S. 279, 287 (1991).

### I. Section 727(a)(2)(A) – Fraudulent Transfers

**A. Legal Standard**

According to 11 U.S.C. § 727(a)(2)(A), the Court shall grant a debtor a discharge unless:

> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed--
>
> > (A) property of the debtor, within one year before the date of the filing of the petition . . . .

"In order for a debtor to be denied a discharge under § 727(a)(2)(A), the objector must show by a preponderance of the evidence that (1) the debtor transferred, removed, concealed, destroyed, or mutilated, (2) property of the estate, (3) within one year prior to the bankruptcy filing, (4) with the intent to hinder, delay, or defraud a creditor." *In re Brown*, 108 F.3d at 1293. "'To deny a discharge under § 727(a)(2), a court must find *actual* intent to defraud creditors.'" *In re Warren*, 512 F.3d 1241, 1249 (10th Cir. 2008) (quoting *Marine*

11

*Midland Bus. Loans, Inc. v. Carey* (*In re Carey*), 938 F.2d 1073, 1077 (10th Cir.1991)). "Because rare is the occasion when a party lays bare his or her subjective intent, '[f]raudulent intent ... may be established by circumstantial evidence, or by inferences drawn from a course of conduct.'" *Id.* (quoting *Farmers Coop. Ass'n of Talmage, Kan. v. Strunk,* 671 F.2d 391, 395 (10th Cir.1982)).

Although bankruptcy courts in the Tenth Circuit have relied on various factors when inquiring into alleged actual fraudulent intent behind a transfer, *see, e.g.*, *In re Gollehon*, 2014 WL 2892383, at *11 (Bankr. D. Colo. June 25, 2014), *aff'd on other grounds,* 2015 WL 1746496 (10th Cir. BAP (Colo.) Apr. 17, 2015), the Uniform Fraudulent Transfer Act ("UFTA") contains the most comprehensive list of factors typically considered by bankruptcy courts in this context, *see In re Candelaria*, 18-13232 T7, 2022 WL 89154, at *7-8 (Bankr. D.N.M. Jan. 7, 2022) (relying on Uniform Fraudulent Transfer Act's badges of fraud). As enacted in Colorado, the UFTA's 11 badges of fraud are:

(a) The transfer or obligation was to an insider;
(b) The debtor retained possession or control of the property transferred after the transfer;
(c) The transfer or obligation was disclosed or concealed;
(d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
(e) The transfer was of substantially all the debtor's assets;
(f) The debtor absconded;
(g) The debtor removed or concealed assets;
(h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
(i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
(j) The transfer occurred shortly before or shortly after a substantial debt was incurred; and
(k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Colo. Rev. Stat. § 38-8-105(2). The Court has wide discretion when making its determination and this list of factors is not exhaustive. *Id.*; *In re Blair*, 594 B.R. 712, 742-43 (Bankr. D. Colo. 2018).

**B. Medical Practice Transfers to Sekelsky**

Although there are open questions regarding which transferred assets were actually "property of the debtor" as required by 11 U.S.C. § 727(a)(2)(A) (and who did the transferring), because the parties did not develop that issue, the Court will not address it. The only disputed issue is whether Young possessed the intent to hinder, delay, or defraud a creditor.

The circumstances surrounding the transfers of YFM and WPFM's assets to Sekelsky certainly raise suspicion concerning Young's intent. Irregular, round-number cash transfers between bank accounts commenced immediately after service of Colarelli's writs of garnishment; within a month after the garnishments Young sold WPFM's medical assets and the YFM entity (for $1) to Sekelsky; and afterward WPFM continued to make cash transfers to YFM that were not contemplated in the asset purchase agreements. When taken alone, these circumstances would be sufficient to infer the requisite intent to defraud, hinder, or delay creditors and to deny Young his discharge pursuant to 11 U.S.C. § 727(a)(2)(A).

After careful consideration of the facts of this case, the Court sees several mitigating factors that favor Young. In the months leading up to this period in his life, Young developed significant health issues requiring treatment. His doctor and his attorney advised him to step away from business ownership. He now takes medication for the treatment of ongoing health issues. Young credibly testified that he did not understand the significance of the garnishments when they were served. His and Sekelsky's testimony established that, at baseline, he is disorganized in tracking even his personal obligations and does not run businesses effectively. At all relevant times, Young was under intense pressure to pay all his various business and personal obligations, due in part to the discontinuation of the Highlands practice, and was fighting to survive economically without regard for which accounts paid which obligations. Against this backdrop, it is difficult for the Court to infer fraudulent intent from the circumstances.

Although, in the month following Colarelli's garnishments, the garnished Matthew Young P.C. and WPFM entities made upwards of $50,000 in transfers to Young's non-garnished personal bank account, during the same period they also transferred over $14,000 between themselves and clearly within reach of Colarelli. Preserving large amounts of money in accounts subject to garnishment cuts against inferring nefarious intent from the transfers between the accounts. Additionally, transferring large amounts of money from the garnished accounts into Young's personal account via irregular, round-number-amounts was a practice pre-dating the garnishments. In the approximate one-month period prior to Colarelli's garnishments, Matthew Young P.C. transferred roughly $15,000 to Young's non-garnished personal bank account in this manner. Most importantly, Young's personal bank account paid Young's professional obligations immediately following the $50,000 in transfers from Matthew Young P.C. and WPFM. Young's personal account made bi-weekly payments for employee wages and taxes (via ADP) starting on July 18, 2019, and continuing until September 13, 2019. These wage payments total approximately $62,000 (roughly $12,400 bi-weekly). The payments provide an explanation for the transfers out of the garnished accounts in the month following the garnishments and corroborate Young's testimony that he was trying to survive and pay his personal and professional obligations in any way he could. He was not hiding assets to frustrate his creditors; he was paying his ongoing obligations.

The Court notes that although there is no evidence that Colarelli attempted to garnish Young's personal account, it certainly could have done so and, if unknown at the time, could have discovered Young's personal account through post-judgment discovery pursuant to Colo.R.Civ.P. 69.

Young and Sekelsky's testimony adequately explained the $1 valuation of YFM. It was incorrectly formed as an LLC rather than a PLLC, did not operate as a business prior to the transfer, and Young committed an oversight by not including the $400-1,000 of YFM's cash on hand—an understandable oversight given his pattern of disorganization, poor mental state, and dire economic circumstances in August 2019.

Additional suspicious bank transfers happened in September and October 2019 when WPFM's account continued to receive contributions from accounts receivable and transferred over $26,000 of that to YFM. Although Colarelli argues that this contravention of the asset purchase agreement is evidence of Young's continued control over YFM, the Court fails to see how the transfer of funds from one garnished entity, WPFM, to another, YFM, establishes Young's intent to avoid creditors. Regardless of who controlled YFM, if Young's funds were in YFM's bank account, they would have been subject to garnishment—a remedy available at state law.

### C. Cash Transfers to Sekelsky and Eileen Young

The credible, consistent testimony of both Young and Sekelsky plausibly explained the $49,000 in transfers made from Young to Sekelsky.

The $40,000 was a gift, memorialized by a gift letter, made as Young's contribution to Sekelsky's purchase of a new home for they and their children to live in. Young made the gift by drawing from his 401k (an exempt asset) when he was unable to obtain financing due to his poor personal credit. Not only was this gift an exchange for value, but it created a claimed homestead exemption for Young and gave him a place to live.

The separate $4,000 and $5,000 transfers were made as Young's share of living expenses, to which he had not contributed for some time before. Neither Young nor Sekelsky expected Young to live in the home for free, and he made these transfers as his share of living expenses–not with the intent of hindering, delaying, or defrauding his creditors.

The trial testimony also established that Young had informally employed his mother, Eileen Young, to make reminder phone calls to patients for several years on behalf of Young's different medical practices. The $500 checks paid to her were in exchange for services performed. They were not made with the intent of hindering, delaying, or defrauding his creditors.

## II. Section 727(a)(4)(A) – False Oaths

### A. Legal Standard

According to 11 U.S.C. § 727(a)(4)(A), the Court shall grant a debtor a discharge unless:

> (4) the debtor knowingly and fraudulently, in or in connection with the case--

14

>    (A) made a false oath or account . . . .

"In order to deny a debtor's discharge pursuant to this provision, a creditor must demonstrate by a preponderance of the evidence that the debtor knowingly and fraudulently made an oath and that the oath relates to a material fact." *In re Brown*, 108 F.3d at 1294. "A false oath may be either: (1) a false statement or omission in the debtor's schedules or (2) a false statement by the debtor at an examination during the course of the proceedings." *In re Garland*, 417 B.R. 805, 814 (Bankr. App. 10th Cir. 2009) (quotation omitted). A false oath is material if it relates to the debtor's "business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property" even if the undisclosed asset is valueless. *Id.* (citations omitted). "[F]raudulent intent may be deduced from the facts and circumstances of a case." *Id.* (quoting *In re Calder*, 907 F.2d 953, 956 (10th Cir. 1990)).

A debtor will not be denied a discharge if a false statement is due to mere mistake, inaccuracy, or inadvertence. *In re Brown*, 108 F.3d at 1295-96. However, "reckless indifference to the truth has consistently been treated as the functional equivalent of fraud for purposes of § 727(a)(4)(A)." *In re Garland*, 417 B.R. at 815 (quotation omitted). But "[e]ven a false statement resulting from ignorance or carelessness does not rise to the level of knowing and fraudulent sufficient to deny a discharge." *In re DiGesualdo*, 463 B.R. 503, 522 (Bankr. D. Colo. 2011) (citations omitted). "The fact that a debtor comes forward with omitted material of his own accord is strong evidence that there was no fraudulent intent in the omission." *In re Brown*, 108 F.3d at 1296.

### B. Analysis

All of Young's alleged false oaths satisfy the test for materiality. However, there are questions regarding whether they are false and whether Young made them knowingly and fraudulently.

To begin, a number of Young's alleged false oaths are not actually false. Although Young's 2019 income was significantly higher than the $41,800 listed in his statement of financial affairs, he also listed $24,172 of "other income" from "1099 Young Fam Medicine," which was taken from his professionally-prepared tax return. He also included $100,000 from "401k withdrawal." Similarly, although his bankruptcy schedule listed $3,035 as the balance in his USAA account on the date of his bankruptcy filing when the actual balance was $7,287, Young had completed his bankruptcy paperwork approximately two weeks earlier when the balance was $3,035. He then updated the balance to $7,287.52 on the trustee information sheet for his 341 meeting. Finally, despite Colarelli's allegation to the contrary, Young included his $2,033 in monthly VA benefits in his schedules.

Several of Young's other alleged false oaths resulted from mistakes, carelessness, or inadvertence. Although Young listed the home's mortgages despite not being personally obligated on their notes, Young is titled on the home and has been paying at least one, if not a portion of both, mortgages. He contributed $40,000 toward the purchase of the home, plus contributed rent/mortgage payments via a portion of $9,000 later transferred to Sekelsky. He also scheduled the home as shared ownership "with another."

It is reasonable that debtor would include the home's mortgages on his statement of financial affairs when he is titled on a home, contributing to the home's initial purchase, paying a large share of the home's ongoing mortgage obligation, and scheduling that home as "owned."

Conversely, Young failed to disclose the $40,000 gift to Sekelsky for the purchase of their home, as well as the later $9,000. These were not straightforward transfers of funds without any return. Young gifted the $40,000 to Sekelsky for the purchase of the home in which they live with their children, and in exchange for living there and getting titled. It gave rise to a homestead exemption that he claimed on his schedules. The $9,000 was paid as Young's share of household expense that he had not been able to pay for the preceding months due to his financial circumstances. Although careless, these omissions do not appear to be made knowingly and fraudulently.

Similarly, to the extent they required disclosure, it was reasonable for Young to omit the $500 payments to his mother because they were ordinary course payments made in exchange for services performed for his medical practice.

Young explicitly omitted the debt on the Nissan Titan truck because he is not obligated on it and was not making payments, a fact that cuts against a pattern of Young attempting to minimize his assets and inflate his liabilities.

Young testified he committed an oversight by not listing Matthew Young P.C., but he did not list it because it did not generate income, did not provide services, and was not in good standing with the Colorado Secretary of State. Bank records reveal that, at the time of filing, the Matthew Young P.C. bank account had a balance of $245.87 and maintained a similarly-low running balance for several months prior and subsequently. Most of the activity during this stretch appears to be automatic transfers. Although the value of the undisclosed Matthew Young P.C. is immaterial to the false oath inquiry, the low balances and lack of activity in the Matthew Young P.C. account corroborates Young's testimony that not disclosing Matthew Young P.C. was an oversight.

Finally, Young failed to list the sale of YFM and of WPFM's assets to Sekelsky. As alluded to above, aside from a brief mention during closing argument, the parties did not expound on whether WPFM's assets were assets of "the debtor" or whether Young and WPFM should be subject to a reverse piercing of the corporate veil. As presented to the Court, the Court doubts that WPFM's assets are assets of "the debtor." *See Gallan v. Bloom Business Jets, LLC*, 480 F.Supp.3d, 1182–83 (D.Colo., 2020) (collecting cases on the concept of a debtor owning an interest in an LLC but not owning the LLC's assets). Nonetheless, although Young did not disclose the sale of WPFM's assets, Young disclosed his interest in WPFM. Even though Young failed to disclose the $1 sale of his interest in YFM, that omission was inadvertent because Young believed the $1 transfer of a non-operating business was nominal. Since Young certainly was not attempting to conceal the $1 he received in the sale, the Court fails to see what fraudulent intent could underly this omission.

16

### III. Court's Discretion Under 11 U.S.C. § 727(a)

Ultimately, this case presents a very close call. Young's true intent behind his transfers and oaths is not immediately clear. A number of transfers and oaths could provide a basis for denial of discharge. However, in the end, "[c]ompletely denying a debtor his discharge, as opposed to avoiding a transfer or declining to discharge an individual debt pursuant to § 523, is an extreme step and should not be taken lightly." *Rosen v. Bezner*, 996 F.2d 1527, 1531 (3d Cir. 1993). The determination whether to deny discharge "requires the Court to evaluate whether 'the debtors' prepetition debt is of such magnitude that denial of a discharge would make life virtually impossible for them' and to balance that against 'the degree of heinousness evidenced by the circumstances of the violation of the bankruptcy laws which constitutes the ground for denial of discharge.'" *In re DiGesualdo*, 463 B.R. 503, 524 (Bankr. D. Colo. 2011) (quoting *Matter of Hacker*, 90 B.R. 994, 997-98 (Bankr. W.D. Mo. 1987)).

Young has over $4.4 million in unsecured, primarily business debts. Colarelli's portion (for which it did not file a proof of claim) is $281,000. Colarelli obtained its judgment by default because Young could not afford to defend the suit—a suit in which his similarly-situated business associate prevailed. It is not lost on the Court that Colarelli could have filed a mechanic's lien on the property or sued the other doctors in Highlands to recover its claim, although there is no evidence of it having done so. Additionally, the chapter 7 trustee has not opposed Young's discharge nor sought to recover any additional estate property. The same is true for Young's largest creditor, Sunflower Bank, who holds unsecured claims totaling nearly $1.3 million.

In addition to contributing to a home for himself, Sekelsky, her three children, and his three children 38% of the time, Young is paying spousal support and child support to his ex-wife. Given the number of mitigating circumstances and plausible explanations for Young's questionable transfers and oaths; the staggering amount of debt that he currently carries; the relatively small amount and unique circumstances underlying Colarelli's claim; and the number of people who depend on Young for their well-being, including patients and multiple households, the Court finds that denying Young's discharge would make life virtually impossible for him. Therefore, the Court will not deny Young's discharge.

### CONCLUSION

As set forth above, liberally construing the Bankruptcy Code in favor of Young, the Court concludes he is entitled to discharge and DISMISSES WITH PREJUDICE the claims asserted by Colarelli, with each party to pay its own fees and costs.

Dated this 13th day of July, 2022.

BY THE COURT:

_____
Joseph G. Rosania, Jr.
United States Bankruptcy Judge

17